UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ALPHONSO ROGERS, | ) | |
| | ) | |
| Plaintiff, | ) | 10 C 1840 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| WAUKEGAN PUBLIC SCHOOL DISTRICT 60, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Alphonso Rogers alleges in this suit that Defendant Waukegan Public School

District 60: (1) discriminated against him on the basis of his race (African-American) in

violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., when it

suspended him, changed the terms of his employment, issued him a reprimand letter, and

ultimately fired him; (2) fired him in retaliation for his filing a discrimination charge with the

Equal Employment Opportunity Commission ("EEOC"), also in violation of Title VII; and (3)

breached its state law contractual obligations by failing to pay him for unused sick days and

vacation days. Doc. 72 (third amended complaint). The District has moved for summary

judgment. Doc. 134.

The motion is granted in part and denied in part. The District is entitled to summary

judgment on Rogers's Title VII discrimination claim, except as it relates to his termination. For

each of the other alleged discriminatory actions, the District either has shown that the action was

not a "materially adverse employment action" or has provided a legitimate, nondiscriminatory,

and unrebutted reason for taking the action. The District is not entitled to summary judgment on

the discriminatory termination claim because Rogers has adduced enough evidence of pretext to rebut the District's nondiscriminatory explanation for firing him. Nor is summary judgment granted on the retaliation claim; the District's sole argument—that it decided to fire Rogers before learning that he had filed an EEOC charge—fails because a reasonable jury could find that the termination decision was made after the District learned of the charge. Finally, the District is entitled to summary judgment on Rogers's contract claim because the contract unambiguously provides that Rogers was not entitled to the pay he seeks for the unused vacation days and sick days.

## Background

The following states the facts as favorably to Rogers as the record and Local Rule 56.1 allow. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). In considering the District's summary judgment motion, the court must assume the truth of those facts, but it does not vouch for them. *See Smith v. Bray*, 681 F.3d 888, 892 (7th Cir. 2012).

The District is a public school system in Waukegan, Illinois, that operates a high school and several middle schools and elementary schools. Doc. 153 at ¶¶ 2-3. At the top of the District's decisionmaking hierarchy is the Board of Education, whose seven elected members make decisions by majority vote. *Id*. at ¶ 4. The District's day-to-day operations are overseen by a superintendent hired by the Board. *Id*. at ¶ 5. Dr. Donaldo Batiste was the superintendent at all relevant times. *Ibid*. Although the superintendent makes many decisions on his own, the Board makes termination decisions after a recommendation from the superintendent. *Id*. at ¶ 6.

Rogers began working for the District in 1985. *Id*. at ¶ 9. He was employed as the Director of Safety and Security for much of that time. *Ibid*. Prior to July 2006, Rogers reported

directly to the superintendent and had significant autonomy in managing the Safety Department. *Id*. at ¶ 11. That month, the District hired Jules Gaudin to serve as deputy superintendent and chief operating officer. *Id*. at ¶ 12. At that point, Rogers began reporting to Gaudin rather than to Batiste. *Ibid*. Gaudin, a certified public accountant, worked with Rogers to cut costs by bringing oversight and accountability to the Department's payroll practices. *Id*. at ¶¶ 13-15.

Rogers signed off on the payroll forms submitted by his subordinates before they were sent to the District's payroll clerk. *Id*. at ¶ 20. Rogers had previously allowed safety officers to change their scheduled hours without recording the changes on their time sheets; Rogers referred to this practice as the "honor system." *Id*. at ¶ 23. Some of the safety officers held full-time employment with other employers while also working full-time for the District. *Id*. at ¶ 24. In July 2007, the wife of a safety officer told Gaudin that she believed that her husband had been receiving pay for hours he had not worked and that he had told her that he could take as much overtime as he wanted, though he seemed not to be working very much overtime. *Id*. at ¶ 26.

Gaudin went to the police, whose investigation resulted in the arrest and criminal prosecution of some officers, who ultimately were acquitted. *Id*. at ¶¶ 27, 30; Doc. 158 at ¶ 6. The District retained an outside company, Probe International, Inc., to perform an independent investigation of the Safety Department's timekeeping and payroll practices. Doc. 153 at ¶ 34. In January 2008, during the Probe investigation, Rogers overheard Sonny Garza, a board member, tell one of the District's custodians that he (Garza) was out to get Rogers and the rest of his staff, whom Garza referred to as "niggers." *Id*. at ¶ 32; Doc. 158 at ¶ 7.

In February 2008, Batiste decided to place Rogers on paid suspension pending Probe's investigation to ensure that he would not interfere with the investigation or influence the Safety

Department employees whom Probe would be interviewing. Doc. 153 at ¶ 36. Batiste appointed

William Newby, who is white, to serve as the interim Director of Safety in Rogers's place. *Id*. at

¶ 37. Newby's ambition was not to hold onto that job but to assume a higher position in the

District. *Id*. at ¶ 38. Batiste feared that Newby (who had been an unsuccessful candidate for

principal of the District's high school earlier in 2008) might quit working for the District

altogether if not given a job with more responsibility. *Id*. at ¶ 39. In May 2008, Batiste

recommended and the Board approved the creation of a new high-level position, the Executive

Director of Campus Relations, Operations, and Safety, to oversee various District operations,

including the Safety Department, and appointed Newby to the new position. *Id*. at ¶¶ 40, 43.

Rogers asserts that "[a]round April or May of 2008, Batiste called Rogers into his office

shortly after the new board was elected and said this group of board members is out to get you.

He implied it was racially motivated because of Rogers' association with the African-American

board members." Doc. 158 at ¶ 13. But in the portions of his deposition transcript cited to

support this assertion, Doc. 155 at 9, Rogers fails to explain or justify his inference that Batiste

thought the new Board's dislike of Rogers may have been racially motivated, and so the court

will disregard that unsupported and conclusory assertion. As discussed below, the Board was

racially diverse, with three white members, two Hispanic members, and two African-American

members as of April 2008. Doc. 153 at ¶ 4.

Around May 2008, another Board member, Mark Hawn, spoke with Batiste about the

Safety Department and said that Rogers should be removed from the Director position so that the

District could professionalize the Department. *Id*. at ¶ 46. Hawn's two children had attended the

Waukegan public schools in the late 1980s and early 1990s, and during that time Rogers had

disciplined them for using the term "nigger" at school. *Id*. at ¶ 47. Hawn challenged Rogers at the time, saying that Rogers was picking on his children; later, when one of Hawn's children moved across the street from Rogers, Hawn told Rogers that he did not want any "shit" from Rogers now that his son was Rogers's neighbor. *Ibid*. Rogers inferred from these interactions that Hawn had a personal vendetta against him. Doc. 158 at ¶ 12.

After completing its investigation, Probe submitted to the District a report stating that Rogers had failed to follow the applicable timekeeping procedures, had created the impression of favoritism by approving excessive overtime pay for only some safety officers, and had mishandled funds that students paid to the Safety Department in exchange for temporary student IDs and parking passes. Doc. 153 at ¶¶ 48-49. Rogers disputes the truth of Probe's assertions, and so the court will assume that they were incorrect; but Rogers does not dispute that Probe's report made those assertions and that the District had a ground for believing them. *Ibid*.

In July 2008, Rogers's suspension ended and he returned to his position as Director of the Safety Department. *Id*. at ¶ 52. At that point, he reported to Newby rather than Gaudin. *Ibid*. Rogers's responsibilities and perquisites as Director were diminished by the creation of Newby's job as Executive Director of Campus Relations, Operations, and Safety: Rogers lost some of his budgeting, payroll, and scheduling responsibilities; he was moved to a smaller office, which measured 11.5 feet x 11 feet (Newby's was 14 feet x 13 feet); and he had to drive a different District vehicle than the one he had previously used. *Id*. at ¶¶ 53, 56. Because of the timekeeping and payroll problems discussed by the Probe report, Batiste directed Newby to handle the Safety Department's payroll functions himself. *Id*. at ¶ 57.

Rogers viewed Newby as a difficult and demanding supervisor. *Id*. at ¶ 58. In August 2008, Newby memorialized in writing a verbal warning he had given to Rogers concerning his behavior at a meeting with the high school's principal about whether to install metal detectors. *Id*. at ¶ 80. The warning did not result in the loss of any pay, benefits, position, or prestige. *Ibid*. In another incident, Rogers wanted to hire an African-American to fill an open position and Newby refused; Newby told Rogers that one of the complaints that others at the District had about him was that he always wanted to hire African-Americans. Doc. 158 at ¶ 26. Rogers told Batiste that he thought Newby was being extremely racist. *Id*. at ¶ 25.

Also in August 2008, the Board voted unanimously to fire two Safety Department employees who had been investigated for allegedly receiving unearned compensation. Doc. 153 at ¶ 60. The Board also discussed Rogers, and though no member suggested that he be fired, the Board did request that he attend a due process hearing to discuss the Board's concerns about how he had managed the Department before the Probe investigation. *Id*. at ¶ 61. The hearing was scheduled for August 22, but Rogers requested a continuance and then went on a continuous period of sick leave, medical leave, and vacation leave. *Id*. at ¶¶ 52, 62. Rogers remained on leave throughout the entire 2008-2009 school year and never attended a due process hearing. *Id*. at ¶ 64. Newby assigned Rogers's duties to other employees while he was out, but Rogers could have resumed those at any time had he returned to work. *Id*. at ¶ 64.

In December 2008, Rogers briefly returned to the office after being notified that he had exhausted his leave under the Family and Medical Leave Act. Doc. 158 at ¶ 31. Newby yelled at Rogers, asking him why he was there and why he did not have a doctor's excuse. *Id*. at ¶ 32. Rogers told another employee, Fred Howard, that Newby was "being discriminatory against

him" and that he was going to file a discrimination lawsuit, *ibid.*, though in fact he did not take any legal action at that time.

Rogers asserts that an alderman named Sam Cunningham told him during a March 2009 telephone call that the "white board" was out to get him and wanted to replace him with Waukegan's police chief. *Id.* at ¶ 33. The only record evidence that Rogers cites to support this assertion is testimony from Rogers's own deposition: "I had a phone call from Sam Cunningham, an alderman in the city, who indicated that the white board—because that's how they described themselves. The white board was going to go after me and put Bill Baing, the current Chief of Police, in my position." Doc. 134-8 at 8. This testimony is hearsay under Federal Rule of Evidence 801(c) because Rogers testified to the statement of an out-of-court declarant, Cunningham, in an effort to establish the truth of the matter asserted by the declarant: that a group calling itself the "white board" was "out to get" Rogers and wanted to replace him with Baing. No exception to the ban on hearsay applies to the statement, and so the court will disregard it. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996) ("a party may not rely upon inadmissible hearsay in an affidavit or deposition to oppose a motion for summary judgment").

It also is not clear what the phrase "white board" means. Rogers asserts that "[t]here was a group of board members that referred to themselves as the 'white board,'" which implies a reference to the race of those Board members. Doc. 158 at ¶ 4. But in the portion of his deposition transcript cited to support this assertion, Rogers admitted that he never heard any Board members classify themselves as the "white board" and that he does not remember which Board members were viewed as the "white board." Doc. 155 at 8. It is undisputed that the

Board elected in Spring 2007 consisted of the following seven members: June Maguire (white), Anita Hanna (African-American), Bill Anderson (white), Rita Mayfield-Jenkins (African-American), Patricia Jones (African-American), Sonny Garza (Hispanic), and Mark Hawn (white). Doc. 153 at ¶ 4. In June 2007, Jones died and was replaced by Michael Rodriguez, who is Hispanic. *Ibid*. Rogers further asserts that Hanna "stated she heard that Hawn, Garza and Mayfield-Jenkins were out to get rid of Rogers and other members of top leadership," Doc. 158 at ¶ 5, but he does not say that their desire to "get rid of … top leadership" was based on racial animus. If Hawn, Garza, and Mayfield-Jenkins—a white man, a Hispanic man, and an African-American woman—are the Board members whom Rogers is suggesting constituted the "white board," then, even making all reasonable inferences in Rogers's favor, the court cannot place any significance on that phrase and will accordingly disregard it.

The District faced a reduced budget for the 2009-2010 school year due to decreases in state funding and property tax revenue. Doc. 153 at ¶ 65. To deal with the shortfall, Batiste drew up a plan to reduce the District's staffing by eliminating around 57 positions, including the Director of Safety position held by Rogers. *Id*. at ¶¶ 67-69. Newby opposed the elimination of Rogers's position. *Id*. at ¶ 67. At a meeting on April 17, 2009, the Board voted five-to-one to approve Batiste's reduction-in-force proposal; the Board's seventh member was absent. *Id*. at ¶¶ 68-69. The termination letters sent to the terminated personnel were dated April 17, with the exception of the letter to Rogers, which was dated April 24. Doc. 158 at ¶ 37. Rogers's letter was mailed on April 24. *Id*. at ¶¶ 35-36.

Meanwhile, on April 15, 2009—two days before the Board voted to approve Batiste's proposed terminations, and nine days before the District dated and mailed Rogers's termination

letter—Rogers filed a discrimination charge against the District with the EEOC. Doc. 153 at
¶ 70. The District received notice of the EEOC charge on April 20. *Ibid*. Rogers believes that
the decision to terminate him was made after April 17, and thus after the other termination
decisions, because the other employees' termination letters were dated April 17 while Rogers's
letter was dated and sent on April 24, four days after the Board learned on April 20 of his
discrimination charge. *Ibid*. The District has not submitted indisputable evidence to support the
proposition that it decided to fire Rogers on April 17, and a reasonable jury could infer from the
April 24 date on his termination letter that the decision was made after the District learned on
April 20 that Rogers was accusing it of race discrimination. Accordingly, the court will assume
for purposes of summary judgment that the District decided to fire Rogers after it received notice
of his EEOC charge, at some point between April 20 and April 24.

As for Rogers's contract claim regarding payment for unused sick days and vacation
days, the parties agree that the following policies applied to Rogers. He could have used any
accrued sick time to increase his pension credit had he remained in the District's employ until
retirement, but he was not entitled to be paid out for that accrued time upon termination. *Id*. at
¶ 73. Unused vacation days remaining at the end of the school year are lost unless the Board or
the superintendent grants a carryover. *Id*. at ¶ 74. In September 2008, Rogers asked to be
allowed to carry over fifteen accrued vacation days left over from the prior school year, and
Batiste allowed him to carry over ten. *Id*. at ¶ 75. In March 2009, Rogers asked that the other
five days be carried over as well, but the request was denied. *Id*. at ¶ 78. Rogers was allotted 22
vacation days for the 2008-2009 school year and he used four of them, so with the addition of
the ten days he carried over, he had 28 unused vacation days when he was terminated at the end

of the 2008-2009 school year. *Id*. at ¶ 76. In June 2009, the District sent him a check for those 28 days. *Id*. at ¶ 77. Rogers's contract claim focuses on the District's refusal to pay him for the five vacation days he was not allowed to carry over and for his accrued sick days.

After receiving a right-to-sue letter from the EEOC, Doc. 72-1 at 15, Rogers and seven other plaintiffs filed this lawsuit against the District, Doc. 1. The other plaintiffs have settled, Docs. 111, 123, leaving Rogers as the only remaining plaintiff.

### Discussion

Rogers advances race discrimination and retaliation claims under Title VII and a contract claim under state law. The claims will be addressed in turn.

## I.      Title VII Race Discrimination

Rogers alleges that the District discriminated against him on the basis of race (1) when it put him on temporary paid suspension, (2) when it changed the terms of his employment after he was made Newby's subordinate, (3) when Newby issued Rogers a written warning, and (4) when the District terminated him. Doc. 72 at pp. 40-45.

A Title VII race discrimination plaintiff may seek to defeat summary judgment under the direct and indirect methods of proof. *See Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). Rogers proceeds under the indirect method, which has three steps. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). First, the plaintiff must make a prima facie case of discrimination, which requires him to establish that (1) he is a member of a protected class, (2) his job performance met his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than he was. *See Coleman*, 667 F.3d at

845.  Second, if the plaintiff makes a prima facie case, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for its action.  *McDonnell Douglas*, 411 U.S. at 802.  Third, if the defendant articulates such a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff, who must provide evidence that the defendant's stated reason is pretextual.  *Id.* at 804-05.  "Pretext is more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action."  *Silverman v. Bd. of Educ. of Chi.*, 637 F.3d 729, 733-34 (7th Cir. 2011) (alteration in original) (internal quotation marks omitted).

The parties' arguments center on the third prong of the prima facie case—whether the allegedly discriminatory acts constitute materially adverse employment actions—and the second and third steps of the indirect method, which look to whether the District has articulated legitimate, nondiscriminatory reasons for taking those actions and whether Rogers has adduced evidence that those reasons are pretextual.  The District is entitled to summary judgment on each component of Rogers's discrimination claim, except for the component alleging that he was fired due to his race.

### A.      Paid Suspension

Rogers claims that the District discriminated against him when Batiste put him on paid suspension during Probe's investigation of the Safety Department's payroll and timekeeping practices.  The District responds that Batiste had a legitimate, nondiscriminatory reason for suspending Rogers: "He wanted to avoid the possibility of Rogers' interfering with the [Probe] investigation or retaliating against those interviewed" by Probe.  Doc. 135 at 8.  Rogers responds that the suspension "was done without any internal investigation taking place beforehand or a

finding that Rogers was guilty of any wrongdoing." Doc. 152 at 12. That appears to be correct. But Rogers does not dispute that Batiste intended the suspension to safeguard Probe's investigation by preventing Rogers, who ran the Department and had engaged in the practices that Probe had been retained to investigate, from interfering with the investigation. *Ibid*. The District could not be expected to have determined that Rogers was guilty of wrongdoing *before* the investigation had taken place.

Rogers also argues that "there is no evidence that Rogers would have tampered with the investigation or that he was a legitimate risk of doing so. If given the opportunity, Rogers would have done everything in his power to assist the investigators and would not have tried to influence those being interviewed." *Id*. at 12-13. Although that may be true, it was certainly reasonable for Batiste—who at the time could not know whether Rogers had engaged in wrongdoing—to believe that the Probe investigation might uncover wrongdoing by Rogers and that Rogers therefore might interfere with the investigation if he continued to run the Department while the investigation was being conducted. Because Rogers's objections do not undermine Batiste's reasoning in any way, they do not tend to show that Batiste's stated rationale for suspending Rogers was pretextual.

Accordingly, the suspension component of his discrimination claim fails because the District provided a legitimate, nondiscriminatory explanation for the suspension and Rogers failed to adduce evidence that the District's explanation is pretextual.

### B. Changed Terms of Employment While Working Under Newby

Rogers next claims that the District discriminated against him when it changed the terms of his employment upon his return from the suspension, when he had become Newby's

subordinate.  According to Rogers, his employment terms changed because Newby was given some responsibilities previously held by Rogers, and also because Rogers was given a smaller office than he had previously been assigned and was required to drive a different District vehicle than he previously had driven.

The District argues that it had a legitimate, nondiscriminatory rationale for assigning some of Rogers's duties to Newby.  In particular, the District argues that Newby was given a higher-level position with oversight duties over the Safety Department (and other departments) because Newby was a valuable employee who might otherwise have sought other employment. The District adds that "Batiste directed Newby to handle the payroll functions for the Safety Department in light of the payroll and timekeeping problems [during Rogers's tenure] discovered internally and via Probe."  Doc. 135 at 10-12.  These are legitimate and nondiscriminatory reasons for reassigning some of Rogers's duties to Newby.

Rogers argues that he had done nothing wrong when managing the Department's payroll and timekeeping functions, and the court accepts this for purposes of summary judgment, but Rogers does not dispute that Probe's report concluded that Rogers had done wring and that Batiste could reasonably have credited and relied on the report.  Doc. 153 at ¶¶ 48-49.  Again, "[p]retext is more than just faulty reasoning or mistake judgment on the part of the employer; it is [a] lie."  *Silverman*, 637 F.3d at 733 (alteration in original) (internal quotation marks omitted). And Rogers does not dispute that Batiste hoped to retain Newby as a District employee by giving him a job commensurate with his ambitions.  *Id*. at ¶¶ 38-39.  Batiste's decision to give Newby some of Rogers's duties is further justified by the fact that Newby had been acting as the interim director of the Safety Department immediately prior to his promotion, while Rogers was on

suspension. *Id*. at ¶ 37.  Rogers does not adduce evidence that the District's explanations for Batiste's decision are pretextual.  Rogers therefore cannot proceed on his claim that the District violated Title VII by assigning some of his duties to Newby.

As for the smaller office and different vehicle, Rogers cannot make his prima facie case because those changes do not qualify as materially adverse employment actions.  As noted above, a Title VII discrimination plaintiff must show that he suffered a materially adverse employment action.  *See de la Rama v. Ill. Dep't of Human Servs.*, 541 F.3d 681, 685 (7th Cir. 2008); *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) ("Whether the plaintiff proceeds by the direct or indirect method of proof, he must show a materially adverse employment action.").  "A materially adverse employment action is something more disruptive than a mere inconvenience or an alteration of job responsibilities.  While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action.  Otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (citations and internal quotation marks omitted).  The Seventh Circuit has identified three categories of materially adverse employment actions:

> (1) cases in which the employee's compensation, benefits or other financial terms of employment are diminished, including cases where employment is terminated; (2) cases in which a nominally lateral transfer without a change in financial terms significantly reduces the employee's career prospects by preventing him from using the skills in which he is trained and experienced; and (3) [c]ases in which the employee is not moved to a different job or the skill requirements of his present job altered, but the conditions in which he works are changed in a way that subjects him to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment—an alteration that can fairly be characterized as

objectively creating a hardship, the classic case being that of the employee whose desk is moved into a closet.

*Tart v. Ill. Power Co.*, 366 F.3d 461, 475 (7th Cir. 2004) (alteration in original) (internal quotation marks omitted).

The smaller office and different vehicle do not fall into the first or second categories: they are not related to the "financial terms of [Rogers's] employment," and they did not prevent him from using his particular skills. Nor do they fall into the third category. Rogers does not explain what aspects of the new vehicle were objectionable, making it impossible to say that this change subjected him "to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment." This court previously applied the same analysis to hold on summary judgment that a Title VII plaintiff had not suffered a materially adverse employment action when he was assigned a company car that was not as nice as the one he had previously driven, *see Beard v. Don McCue Chevrolet, Inc.*, 2012 WL 2930121, at *6 (N.D. Ill. July 18, 2012), and the same conclusion applies here.

Rogers acknowledges that his new office was 11.5 feet by 11 feet. Doc. 153 at ¶ 56. No doubt anticipating the court's reliance on *Tart*, Rogers refers to the new office as "a closet." Doc. 152 at 10; Doc. 158 at ¶ 23. But even if the new office had indeed previously been used as a closet, Doc. 134-8 at 36 (Rogers's deposition transcript, stating that "[t]hey converted a closet into an office"), the Seventh Circuit's reference in *Tart* to an employee's being moved into a "closet" was not intended to cover every room that had been a closet before it was an office. The reference in *Tart* particularly was not intended to cover a room, like Rogers's new office, that exceeded 125 square feet in area.

### C.  Written Warning from Newby

The written warning that Newby sent Rogers after the meeting with the high school

principal where he opposed installing metal detectors was not a materially adverse employment

action.  It is undisputed that "Rogers did not suffer any loss of pay, benefits, position or prestige

because of" the warning.  Doc. 153 at ¶ 80.  The Seventh Circuit has repeatedly held that

"written reprimands without any changes in the terms or conditions of [the plaintiff's]

employment are not adverse employment actions."  *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594,

602 (7th Cir. 2009); *see also Grube v. Lau Indus., Inc.*, 257 F.3d 723, 729 (7th Cir. 2001)

("unfair reprimands or negative performance evaluations, unaccompanied by some tangible job

consequence, do not constitute adverse employment actions"); *Krause v. City of La Crosse*, 246

F.3d 995, 1000 (7th Cir. 2001) ("With regard to her claim that the letter of reprimand constituted

an adverse job action, the plaintiff-appellant ignores firmly established circuit precedent that a

letter of reprimand is not an adverse employment action *unless the letter is accompanied by*

*some other action, such as job loss or demotion*."); *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir.

1998) ("Absent some tangible job consequence accompanying reprimands, we decline to

broaden the definition of adverse employment action to include them.").

The court notes that Rogers's Local Rule 56.1(b)(3)(C) statement and brief refer to other

negative interactions with Newby, including that Newby refused to let Rogers hire an African-

American candidate for an open job position and told Rogers that others at the District

complained that he always wanted to hire African-Americans, Doc. 158 at ¶ 26, and that Newby

yelled at Rogers when Rogers came to work in December 2008, *id*. at ¶¶ 31-32.  The complaint

does not bring a hostile work environment claim, and without an explicit statement to the

-16-

contrary in Rogers's summary judgment brief, the court assume that he is not seeking to introduce such a claim at this stage.

A hostile work environment claim would fail in any event. In determining whether harassment is actionable under Title VII, the court "must consider the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1046 (7th Cir. 2002) (internal quotation marks omitted). Rogers complains of just a few incidents, only one of which was arguably race-related; the incidents were not particularly severe and were not at all physically threatening or humiliating; and there is no evidence that those incidents unreasonably interfered with his work performance.

### D. Termination

Finally, Rogers contends that he was fired on the basis of his race. The District responds by asserting a legitimate, nondiscriminatory reason for firing him: it faced a budget crunch that forced it to eliminate many positions, and Rogers's position was among those found inessential. Doc. 153 at ¶¶ 65, 67-69. Rogers concedes that the District indeed terminated numerous positions as a way of reducing its spending. *Ibid*. But he argues that the District's use of the budget crunch to justify its decision to fire him is pretextual because the Board was already out to get him due to his race. Doc. 152 at 17-21.

Evidence that a decisionmaker had decided to fire a plaintiff before the asserted reason for firing him (here, the budget crunch) arose can support an inference that the reason is pretextual. Rogers acknowledges that Batiste, not the Board, decided to include Rogers's

position on the proposed list of jobs to be eliminated to deal with the budget crunch. Doc. 152 at 14 ("Batiste was the decision maker who decided to suspend and place Rogers on administrative leave in February 2008 and ultimately eliminate his position in April 2009."); Doc. 153 at ¶ 67 ("Dr. Batiste made the decision to recommend the elimination of the Director of Safety & Security position"). And Rogers points to no evidence that Batiste, as opposed to certain members of the Board, was ever "out to get" him. But Batiste's list of jobs had to be approved by a majority of the Board before it could go into effect, and Rogers's evidence that certain members of the Board were already out to get him because of his race is sufficient to defeat summary judgment on this claim.

The Board approved Batiste's recommendations by a five-to-one vote. Doc. 153 at ¶ 68-69. Rogers has adduced evidence that one Board member, Garza, had previously said that he wanted to get Rogers and had referred to Rogers and his subordinates as "niggers." *Id*. at ¶ 32; Doc. 158 at ¶ 7. Rogers has also adduced evidence that a second Board member, Hawn, disliked Rogers because he had disciplined Hawn's children for using racial slurs some fifteen years earlier. Doc. 153 at ¶¶ 46-47; Doc. 158 at ¶ 12. Drawing all reasonable inferences in Rogers's favor, a reasonable jury could conclude that Garza and Hawn voted to terminate Rogers because of preexisting racial animus, and therefore that the District's asserted nondiscriminatory reason for their two votes—that they wanted to save the District money by eliminating unnecessary jobs—is pretextual. Again drawing all reasonable inferences in Rogers's favor, a reasonable jury could further conclude that Garza and Hawn would have opposed termination of Rogers absent their illegitimate motive, resulting in a three-to-three tied vote. Finally, a reasonable jury could conclude that a tie vote would have prevented Rogers's termination; the District does not

-18-

say how the Board treats ties, but the implication of a system that proceeds by majority vote, Doc. 153 at ¶ 4 ("[p]olicy decisions for District 60 are made by a majority of a Board of Education … consisting of seven Board members"), is that a tie preserves the status quo.  *Cf. Field v. Boyle*, 503 F.2d 774, 779 (7th Cir. 1974) ("'majority' means one more than half of those voting on a particular question"); *United States v. Holcomb*, 657 F.3d 445, 454 (7th Cir. 2011) (Williams, J., dissenting from the denial of rehearing en banc) (noting that "half does not a majority make" in agreeing that a 5-5 split results in the denial of en banc review, which requires a simple majority of the voting active judges, *see* 7th Cir. Operating Procedure 5(d)(1)).

The District argues that Rogers has not presented enough evidence to show pretext because the acts from which Garza's and Hawn's racial animus may be inferred occurred long before they voted to terminate Rogers.  But the only Seventh Circuit cases cited by the District dealt not with pretext under the indirect method, but with the evidence required to show discriminatory intent under the direct method.  Doc. 135 at 20-21 (citing *Egonmwan v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 845, 850 (7th Cir. 2010); *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 721 (7th Cir. 2008); *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007); *Fortier v. Ameritech Mobile Comms., Inc.*, 161 F.3d 1106, 1108, 1111-12 (7th Cir. 1998); and *Indurante v. Local 705, Int'l Bhd. of Teamsters, AFL-CIO*, 160 F.3d 364, 367 (7th Cir. 1998)).  One of those decisions explicitly held that a more relaxed evidentiary standard applies where a plaintiff seeks to establish pretext under the indirect method than where he seeks to establish discriminatory motive under the direct method.  *See Indurante*, 160 F.3d at 367 ("Therefore in what follows we assume that the comments of Burke, McCormick and Zero are merely what the cases have termed 'stray comments'—biased comments 'made by the

decisionmaker but not related to the disputed employment action.' As such, they 'may be relevant to the question of pretext … even though they do not constitute direct evidence of discriminatory intent.'") (quoting *O'Connor v. DePaul Univ.*, 123 F.3d 665, 671-72 (7th Cir. 1997) ("'stray remarks'—made by the decisionmaker but not related to the disputed employment action—may be relevant to the question of pretext under the [indirect method], even though they do not constitute direct evidence of discriminatory intent")). The District did not press the timing issue in its reply brief, after seeing that Rogers sought to proceed only by the indirect method, and so it has not presented an argument that focuses on the pretext element of the indirect method as opposed to the discriminatory intent element of the direct method. Absent such an argument, and because Hawn's and Garza's words and actions could give rise to an inference that they were indeed out to get Rogers on account of his race before the District's budget crunch arose, the District is not entitled to summary judgment on Rogers's discriminatory termination claim.

## II.    Title VII Retaliation

Rogers also claims that the District violated Title VII by firing him in retaliation for filing an EEOC charge accusing it of race discrimination. Doc. 72 at pp. 45-50. The purpose of Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a), is to safeguard the statute's ban on employment discrimination "by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006). "A plaintiff may establish unlawful retaliation using either the direct method or the indirect method of proof." *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009). Rogers proceeds under the direct method, Doc. 152

at 24, which requires a plaintiff to "demonstrate that (1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse action by his employer; and (3) a causal connection exists between the two." *Stephens*, 569 F.3d at 786.

The first two elements indisputably are present here. Rogers's filing of an EEOC charge is "clearly a protected activity under Title VII." *Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 703 (7th Cir. 2012). And termination is unquestionably a materially adverse employment action. *See Lapka v. Chertoff*, 517 F.3d 974, 985-86 (7th Cir. 2008). Rogers's retaliation claim therefore turns on the third element of the direct method, which requires him to adduce evidence of a causal connection between his EEOC charge and his termination.

Rogers argues that the temporal proximity between the District's learning of the EEOC charge and its decision to fire him is circumstantial evidence of causation from which a jury could infer that Rogers was fired in retaliation for filing the charge. Doc. 152 at 24-25. The District responds that it could not have been retaliating when it fired Rogers because it decided to fire him on April 17, 2009, and did not learn of Rogers's EEOC charge until April 20. Of course, the District could not have retaliated against Rogers for something it did not yet know he had done: "When a retaliation claim is based on suspicious timing, the order of events is even more important than the time between them; the theory doesn't work if the retaliatory act precedes the protected activity." *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 676 (7th Cir. 2011) (internal quotation marks omitted). But as shown in the Background section, there is evidence from which a reasonable jury could infer that the District did know about the EEOC charge when it decided to terminate Rogers: the District learned of the charge on April 20, and although the District claims to have made the termination decision on April 17, Rogers's

termination letter was dated and sent on April 24 even though the other employees' termination letters were dated and sent on April 17. Doc. 153 at ¶¶ 35-37, 70-71. This is fishy timing for which the District offers no explanation, let alone an iron-clad one sufficient to sustain summary judgment. Doc. 135 at 23; Doc. 159 at 13-14. A jury reasonably could conclude that Rogers's termination letter was dated and sent a week after the other letters because the decision to terminate Rogers was made only after the District learned of the EEOC charge on April 20.

So the District cannot win summary judgment with the argument that it decided to fire Rogers before learning that he had filed an EEOC charge. And the District does not argue that the temporal proximity between the notice and the termination, taken alone, is insufficient to forestall summary judgment. It therefore has forfeited that argument. *See Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011) ("As the moving party, the [defendant] had the initial burden of identifying the basis for seeking summary judgment."); *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006) ("As a general matter, if the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision."); *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 979 (7th Cir. 1996) ("Only after the movant has articulated with references to the record and to the law specific reasons why it believes there is no genuine issue of material fact must the nonmovant present evidence sufficient to demonstrate an issue for trial."); *Titran v. Ackman*, 893 F.2d 145, 148 (7th Cir. 1990) ("[w]hen a party moves for summary judgment on ground A, the opposing party need not address grounds B, C, and so on"). Accordingly, the District is not entitled to summary judgment on the retaliation claim.

### III.     Breach of Contract

Rogers alleges that the District breached his employment contract (1) by failing to pay him for unused sick days, and (2) by failing to allow him to carry over five unused vacation days from the prior year, for which the District would have had to pay him upon termination had he been allowed to carry them over.  Doc. 72 at pp. 50-52.  Because Rogers's Title VII claims fall within the court's original jurisdiction under 28 U.S.C. § 1331, his state law contract claim falls within the court's supplemental jurisdiction under 28 U.S.C. § 1367(a).  And because the court has denied the District summary judgment on some of the Title VII claims, it will address the merits of the contract claim.

The parties do not discuss choice of law, so the court will analyze the contract claim under the law of the forum state, Illinois.  *See Kochert v. Adagen Med. Int'l, Inc.*, 491 F.3d 674, 677 (7th Cir. 2007) ("Where the parties have not identified a conflict in state law, we will generally apply the law of the forum state.").  "Under Illinois law, [c]ourts interpret contracts with the goal of effectuating the parties' intent, giving contract terms their plain and ordinary meaning.  Of course, the pertinent language must be viewed in context, and the contract must be construed not in a piecemeal fashion but as a whole in determining the parties' intent." *Integrated Genomics, Inc. v. Gerngross*, 636 F.3d 853, 861 (7th Cir. 2011) (citations and internal quotation marks omitted).

Rogers concedes in his Local Rule 56.1(b)(3)(B) response that he was not entitled to be paid out for accrued sick days upon termination.  Doc. 153 at ¶ 73.  His brief says nothing about the sick days issue except that "since Rogers was unable to utilize all of his vacation days due to being suspended and forced to go on administrative leave, he is entitled to the remaining five (5)

vacation days *and forty (40) sick days*." Doc. 152 at 27 (emphasis added). Rogers does not explain why he is entitled to be paid for 40 sick days, particularly given that his Local Rule 56.1(b)(3)(B) response concedes that he had no such entitlement. By failing to make any argument to support his position that he was owed money for his accrued sick days, Rogers forfeited that claim. *See Domka v. Portage Cnty.*, 523 F.3d 776, 783 (7th Cir. 2008) ("It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered.").

Rogers concedes that unused vacation days are lost at the end of the year unless the superintendent or the Board grants a carryover, and also that Batiste granted him a carryover as to only ten of the fifteen days he had accrued by the end of the 2007-2008 school year. Doc. 153 at ¶¶ 74-75, 78. Rogers further concedes that the District paid him upon termination for the 28 unused vacation days he had at the time, though not for the five days that he was not allowed to carry over into the 2008-2009 school year. *Id*. at ¶¶ 76-77. The applicable provision of the District's vacations policy, which the parties assume has contractual force, states as follows:

> Limitations on Carryover
>
> Employees are expected to utilize vacation time in the year that it is earned, absent unusual circumstances. An Employee is entitled to carry over to the next school year up to five (5) days of unused vacation time. Should workload demands necessitate job attendance such that vacation time cannot be used in the year earned, the factors and justification for the nonuse of vacation benefits should be documented by the affected Employee. In such cases, accrual of vacation time, not to exceed ten (10) days for use in the following school year may be authorized by the Superintendent. Approval of carryover of more than 10 days must be sought from the Board.

Doc. 134-5 at 11.

Rogers argues that he was entitled to carry over all fifteen of his unused vacation days because he had been prevented from using them when he was placed on paid suspension during Probe's investigation of the Safety Department's payroll practices, which Rogers says was an "unusual circumstance" within the meaning of the policy. Doc. 152 at 26-27. But nothing in the policy *entitles* an employee to carry over more than five days, even in case of unusual circumstances. The policy states that "[a]pproval of carryover of more than 10 days," which is what Rogers sought, "must be sought from the Board." The policy does not state or suggest that the Board is required to grant the carryover under any circumstances, even "unusual" ones; nothing in the policy purports to limit the Board's discretion to grant or deny the carryover as it chooses. It follows that the Board did not breach the contract when it refused to allow Rogers to carry over more than ten days, and that the District did not breach when it failed to pay him for the five days that were not carried over.

## Conclusion

For the foregoing reasons, the District's motion for summary judgment is granted as to the non-termination portions of Rogers's Title VII discrimination claim and as to his contract claim, and is denied as to his Title VII retaliation claim and as to the termination portion of his Title VII discrimination claim. The case will proceed to trial on the latter claims.

February 14, 2013

_____
United States District Judge

-25-